May it please the Court, I'm Kristen Thayer, a student attorney supervised by Professor Angela Morrison, and I represent Anne Alioto. I'd like to reserve three minutes for rebuttal. All right. Alioto requests this Court reverse the District Court's grant of summary judgment and remand all three claims for a jury trial. Alioto was fired on March 11, 2008, two hours after she complained about sexual harassment. And before that date, she was subjected to a sexualized work environment. This included pornography, chanting of a song about oral sex, and two male coworkers targeting her with specific harassment. If I could interrupt you for just a second. She was fired two hours after she complained, right? But she'd been told she was going to be fired three months before that, hadn't she? That's a disputed issue of fact in this case. Well, can I ask you about that, though? In her deposition, when she was asked, she said she could not remember whether she had been told she was going to be fired. And then she said she did not dispute the fact that she had been told that she would be fired. So can you tell me where in the record I would find something that would indicate that she disputes that she was told in December? Because it is consistent. If she's told in December, if you don't bring your stats up in three months, we're going to fire you. And then in March, which is three months later, she's fired. Doesn't that seem to be consistent? No. There is a dispute because on page 164 of the record, she testified that they told her to just keep trying her best. And that's inconsistent with being told you're going to be fired in three months if you don't get your numbers up. And another issue that shows that this warning is disputed is that it's not in the December 4th write-up. There's no mention of that warning. It was just a pay cut. But when she was asked at the deposition, straight out, simple question, do you dispute that you were told you'd be fired in three months? She says, I don't dispute that. Yes, she says that. That's pretty straightforward, right? Well, looking at the context of what she's saying, she says she doesn't remember and that they told her to keep trying her best. And that just doesn't make sense to be told that you're trying to try your best but that you're going to be fired if your best isn't good enough. And that's one of the disputed issues in this case that the district court resolved in favor of Ace rather than finding it is a dispute. There are other disputed issues in this case that who made this decision is disputed. When it was made, the decision to fire her, when it was made is disputed. The significance of John Johnson, the employee, Ace claims it fired that day as well. That's disputed. Is it a dispute that he was not fired? The significance of that fact is disputed because we don't know if his record looks anything like Alioto's. And we only know that he wasn't performing. But we know that Alioto, that other employees that day were not fired and they were under fire. Who would have the burden at summary judgment stage on that point as to the ground, you know, for these employee comparisons? The burden, it's just that that fact, the burden would be on Ace then to make sure that if they're claiming that fact shows they weren't retaliating, they would need to explain the actual significance of that fact. Are you saying the burden had shifted to them on that point? Not necessarily the burden, but just that fact alone doesn't, just doesn't dispel that there is, that there is circumstantial evidence of pretext in this case. We've focused now somewhat on the timing and on retaliation. I want to go back to your hostile work claim. And the things alleged are bad, but the case law says whatever it is to create a hostile work environment, it has to be severe or pervasive. And the question I would have is since she didn't complain, she doesn't remember any specifics, how has she raised sufficient fact to meet the legal standard of severe and pervasive? There is evidence that meets that legal standard in this case, that there's pornography that Ace knew about, at least from the time she complained, that a male worker showed her a picture of a woman with her vagina opened. That's when she complained, when it's directed at her. And after that, they shut down the computer, right? Yes. They turned on the Internet. I mean, the thing is that there are – that's what you're supposed to do. I mean, complaint, remedy. But a hostile work environment is more than a series of isolated incidents. It has to be, you know, an infection of the workplace. And the courts have, you know, kind of raised it to a very difficult standard, unfortunately, but that's the standard we have to deal with. How would your example meet the legal standard? Because these aren't isolated incidents, and that was the air below. Taking each incident that occurred to her one by one is not the inquiry. It's not what shows that this was an abusive environment. It's viewing the entire environment as a whole. The harassment she experienced occurred in this overall sexualized environment, and it got worse over time throughout her employment at Ace. And she testified that there was a lot of pornography and a lot of people complained, even before she complained about that coworker showing her the pornographic image. Ace also knew Jordan Gulley, the harasser who told Aliotto on March 11th, who blocked her path, grabbed his crotch, and told her to suck on this on March 11th, that employee. Ace knew he was a problem. He admitted he chanted a song called Put It In Your Mouth, a song about oral sex. He and a group of employees chanted this song in the workplace. And he's described as a womanizer who's always looking at women and making remarks that other women had complained about. That's the record at page 171 to 172 shows that. Doesn't she have to be aware of those other instances? Doesn't she have to have personal knowledge of the fact that these things supposedly occurred? Yes. Is there any evidence in the record that she knew? Yes, there is. She's the one who described him as a womanizer in her deposition below and said that he was always making those comments and remarking. And he said that he and a group of employees near Aliotto chanted this song. She's around this environment. It's a very close work environment where the employees' deaths are connected. Do you see any problem with the fact that all of these other employees who were in a very close, proximal relationship to Ms. Aliotto, none of them corroborate any of the statements that she makes? Is that a problem? No, it's not a problem because at the summary judgment stage, the evidence must be viewed in the light most favorably to Aliotto. A jury can decide whether they believe her or whether they would believe the other employees. That's absolutely true, Counselor. But my problem with this is that I've got to see if it is of such pervasive idea that we should send it to the jury because, as my colleague has suggested, it's got to be pervasive or we can't send it to the jury at all. And my worry about that is this. When she complains about the pornography, they turn off the Internet. When she complains about Gulley's first comments about older women, she went in, they told her, well, I think that was a joke. She didn't do any more about that. It was as if, well, you've taken care of my complaint. And then the only other thing there is is the time about the rap song. So I'm trying again. In comparison to Dominguez or Ellison or Prospect Air Services, this is three incidents. Two were immediately taken care of as she would want them to be. One is a question of fact. How does that get pervasive? That's what the district court said. It's pervasive because it is more than those three instances. There's the pornography. There's Gulley just generally being a problem. Well, those are the two I talked about, frankly. And there is – there wasn't adequate remedial action taken after her first complaint. Well, the general problem is a general problem with the case in the sense you can't just sort of throw up your hands and say there's a problem, the environment's bad, these people are womanizers, which may be true, but you need some specificity to those allegations, correct? I mean, the hostile work environment is a fairly specific kind of claim that she's making. So do you have any support for your claim that just saying there's a lot of pornography or he's a womanizer is sufficient specificity to meet the case law? Yes. And that would be in Dominguez-Curry. It doesn't have to be – the harassment does not have to be directed at the employee. Correct. It can be this environment. And what's important here is that she has this sexualized environment, and then she's being targeted in it. And the harassment is getting worse over time because Ace isn't taking adequate action. She told Dwyer, her supervisor, she did what she was supposed to do, that she didn't like the way Gulley looked at her when he told her, I like older women, and came on to her. The record at page 171 says that. Dwyer's response was to tell her, oh, Anne, he's just joking with you. Don't worry about it, completely dismissing her complaint. She had to let it go. Her supervisor, who she's supposed to complain to, wouldn't take the complaint seriously. And then that allowed Gulley's, specifically that harasser, his conduct escalated as a result, culminating in the March 11th event. And this is due to Dwyer's inaction. And we know that banning the Internet didn't stop. This is a sexualized environment she's experiencing throughout her time at Ace. Banning the Internet didn't stop the sexualized environment. There's no evidence they actually disciplined the coworker who showed her pornography. Gulley's behavior didn't stop, but escalated. And there's a dispute over even the actions that Dwyer took on the March 11th, as to whether Gulley was even counseled. And all of this should be taken together and should go to a jury to decide whether her work environment was abusive and whether Ace is liable for that. Counsel, one of the things we have to look at is whether or not a reasonable jury would return a verdict in favor of Ms. Alioto. Now, let me ask you a question. When she was being fired, when she came into the office to be fired by Mr. Velasco, she was told she was being fired. Now, her response wasn't, well, give me another chance. I'll bring my numbers up. Her response wasn't, well, why are you firing me? There's others who aren't keeping their numbers up. Her response was, didn't he tell you that I just complained about the sexual harassment? Now, don't you think that a reasonable jury might very easily say that she was being fired and that this issue of sexual harassment was sort of an insurance policy against being fired? I mean, you follow what I'm saying? The response seems to be, I just complained about sexual harassment. You can't fire me. You see what I'm saying? That would be viewing the evidence in the light favorable to Ace rather than Alioto, which must be done at summary judgment. And the evidence shows that she, for her retaliation claim, that she complained about sexual harassment and is fired right after that. And the timing and the timing as well as the sequence of events on March 11th shows that she's retaliated against. Do you want to save your remaining time? I do. Thank you, Your Honor. Good morning. My name is Sarah Sylvester, and I represent the appellee Associated Creditors Exchange in this matter. And on behalf of the appellee, I ask that this court uphold the district court's order granting summary judgment in favor of Associated Creditors  For contrary to the appellant's argument, it did view the evidence in the light most favorable to the appellant when it found that a reasonable trier of fact could not find in favor of her. She brings three claims up on appeal, that being her sexual harassment claim, the retaliation, and the intentional infliction of emotional distress. I plan to talk about each of those claims in turn, beginning first with the sexual harassment claim. The district court did review the totality of the circumstances and found that the evidence before it did not support that there was a hostile work environment claim. In its order, it set forth that it consider the three instances. The first occurred or involved a coworker by the name of John Marcus. Notably, during her deposition testimony, when asked about this incidence involving John Marcus, she said that she did not consider this sexual harassment and that the only person that did sexually harass her, in her opinion, was Jordan Gulley. The instance involving John Marcus was one isolated incidence. It was one picture of a woman. She described it as pornographic, but when asked at her deposition testimony or at her deposition if the woman was wearing underwear, she could not remember. There also is no evidence in the record that he touched her or threatened her in any way. Similarly, there's no evidence in the record that Jordan Gulley at any time threatened her or physically touched her. That's not her claim. Her claim is a hostile work environment. And, you know, in this day and age, usually people are a little more subtle, so it's pretty rare we see something like this where you've got, you know, a rap song or whatever you want to call it, and you've got oral sex and you've got, you know, scanty photos and things like that. They don't need to touch you to have a hostile work environment, do they? No, they do not. So what does it matter that they didn't touch her? It's a factor to consider when the court examines whether there's been a severe or pervasive hostile work environment. Here we have isolated comments. The first comment that Jordan made was, I like older women, and he looked at Ms. Eliota, the appellant. When asked at her deposition testimony if he could have just randomly been looking at her, she said, I don't know, I don't remember. He did not have any other contact with her, that she alleges, until weeks later, March 11th. Again, that was an isolated incident that she describes that she was walking back to her desk, he momentarily blocked her, got out of the way, said suck on this, and gestured toward his penis. Before you go too far, let me just ask you a question. At page 17 of your brief, you make the following statement. It says, Eliota made a general claim that men looked at pornography at work, but admits she only saw this on one isolated occasion, when Mr. Marcus allegedly showed her a pornographic picture around Christmas 2007. Can you cite me to what part of the record would support that statement? Yes, Your Honor. She describes the incident of John Marcus on part of the excerpts of the record 168. I'm sorry, that's when she admits that Goley was the only one that sexually harassed her. Here's the reason why I'm asking that question. According to Ms. Eliota's counsel, there was this pervasive pornographic atmosphere of people looking at pornography on the computers. That's very inconsistent with your statement. What your statement is, well, it's not inconsistent necessarily, but it certainly goes to determine whether or not there was, you know, a sexual environment. In your statement, she says she only saw one isolated occasion of pornography. I'm trying to figure out which of those two things is true. Correct. In her deposition testimony, she testified that there was pornography in the work environment. However, the only instance that she could describe was the alleged instance around Christmastime of 2007 involving John Marcus. And is there any evidence in the record corroborating her statement that there was a lot of pornography in the workplace that you're aware of? No. The only evidence is her own deposition testimony to that. And even then, she cannot give specifics other than the one time that John Marcus allegedly saw her. She doesn't need any corroboration at summary judgment, correct? No. But the court can consider that she could not give any details or specificity. This is just a general claim that there was pornography in the workplace. She does not say how often it occurred, what the depictions were, when it started. She has to have experienced it herself in order for it to be harassment, right? Correct. And there's no evidence in the record that how she even became aware that there was these pornographic images other than the one that John Marcus showed her. I do have in the record, don't we, at 60 to 61 and at 177, that the collectors in the department sat at connected desks in rows of five collectors, roughly five feet apart, with approximately eight feet between each row, and that they sat next to Ali Oto, which would mean she'd be able to see the screens and hear his comments. Don't we have that in the record? You do have the evidence in the record that they did sit in close proximity. However, she doesn't claim that she did see any of this. In fact, the other collectors, Mary Ochoa, testified that she never saw any inappropriate behavior by Jordan Goley, and there's no evidence that she saw any pornographic images ever in the workplace. I'm interested in the retaliation claim primarily because of the timing. And we have cases that suggest that this kind of proximity and timing, and here they met and she made that statement that Judge Benitez, I believe it was, referred to, why isn't that enough to say, you know, the district court weighed the evidence. We can't do that. We just got to let the jury take it straight up. Well, the temporal proximity that the appellant points to is the timing between when she made the complaint to Mr. Dwyer on March 11th and the timing when it executed her termination. That's the proximity that the appellant relies on when she claims there's a retaliation claim. But importantly, the decision to terminate her was made at the first week of March. It's undisputed facts that are in the record that Mr. Velasco and Mr. Dwyer met at the beginning of March to review her numbers and the other collectors' numbers when it recordized that she was still not meeting her no-deficit quota, that it had been the three months that it had given her to improve and she had not. Go ahead. No, go ahead. My worry about this is, as I read the evidence, the complaint to the supervisor, then the termination two hours later. One of the supervisors was the one to whom she reported the activity. He had previously said, ignore, just joking. She told HR that it was he said, she said. He told HR that it was a he said, she said situation. And then in his declaration, he says, no, he told him it was a sexually explicit rap song. And when I read the sexually explicit rap song, it didn't seem to me that that was a he said, she said situation. Then I read the depositions. Two of the depositions state that the defendant does not terminate people who do not meet their quota, that it depends on the supervisor and how good of friends they are. Now, tell me how that survives a summary judgment. Well, Mr. Dwyer was not the decision maker. It was Mr. Velasco. And the evidence in the record is that he did not know that Ms. Eliotto had made the complaint. The evidence. Well, just a minute. They were right there together. Yes, but the undisputed evidence is that it was Mr. Velasco that made the decision prior to her making the complaint on March 11th. He had, and there's no. But that's the dispute, isn't it? I mean, they, there's no, there's nothing in writing. He's got his declaration. She's got her statement. Nothing happens during that period. Then they, they actually meet. She tells them straight up. I just don't know. I mean, I guess I'm having trouble saying I don't know what happened. It may be, I think they may have a pretty credible explanation. But on summary judgment, I'm not sure how we can credit it. But the evidence in the record, there's no evidence that the appellant can point to that Dwyer told Mr. Velasco in any way about Ms. Eliotto's complaint on the morning of March 11th. Well, they met right afterwards, right? They did to begin the execution of the termination meetings. Right. And again, they were terminating her because she did not meet her no-deficit quota. They met in December. He was told right there on the spot. I mean, that's exactly what she said in response to what, the termination. He being Mr. Velasco was told. But that, again, pointingly, that was after he had decided to terminate her, after they actually began the execution of the termination meeting on March 11th, and after he already told her that we're terminating you because of your numbers. That's when Eliotto said, didn't he tell you, he being Mr. Dwyer, that I made a complaint? That was the first time Mr. Velasco learned about the complaint, after he made the decision, after he started the termination meeting, and after he told her explicitly that they were terminating her because of her numbers. Well, it seems a little hard for me to say that it's just absolutely clear when the supervisor to whom she reports to gets told what the situation is the first time with Gulley and says, oh, it's just joking, then gets told again about it and says, he tells HR, he said, she said situation, sits down with Velasquez in the meeting, and in the meeting that she's terminated, she tells Velasquez exactly what's happening, and he's in the meeting with this Velasquez, and that there's absolutely no way one can get to a jury on the fact that this has to do with retaliation. I disagree, Your Honor. Well, I guess I'm trying to figure out why a question of fact hasn't been shown. Well, there's no undisputed evidence in the record is that it was Mr. Velasco who made the decision. He began the termination meeting. Him telling her, I'm terminating you because you failed to meet your no-deficit quota, which was in accordance with what they had told her from the beginning of her employment and in December before she had ever made any complaints, is evidence that he had legitimate non-retaliatory reasons to terminate her, for which she cannot show as pretextual. Along those lines, let me ask a question. When I was reading the appellant's opening brief, and the appellant was more or less setting out a time frame of how things happened, the appellant said that she had complained about this pornographic picture and that sometime about that time they had the meeting at which she was told, or was not told, that she would be fired. Then when I went back and took a look at the timeline, it seemed to me that the meeting occurred before she complained about the pornographic picture. Do you know which one it is? She complained about the – I'm sorry. She complained she was – she met with Mr. Velasco, excuse me, at the beginning of December. December 4th? Correct. Okay. And then around Christmastime is when she complained about the pornographic picture. So the timeline in the appellant's brief is backwards, basically. If it's set forth that way, yes. It's reversed. Okay. Well, then there's another. She complains about the picture, but then this meeting that takes place between Velasco and Dwyer, when is that? The week before they finally terminate her, correct? It's the first week of March 2011. Right. So they have this meeting, and then they terminate her a week later, is that right? On March 11th. Yes. Okay. Thank you. I also want to point out that Ms. Eliota was terminated because she failed to meet her no-deficit quota. And when Mr. Velasco and Mr. Dwyer met at the beginning of March to review those numbers, they also recognized that another collector had failed to meet his numbers, and they decided to terminate him as well and to terminate him on March 11th, which they did as planned on March 11th. Let me ask you a question. Somewhere along the line they talk about the fact that these meetings to terminate people normally would occur the first week of the month. Was that always the case? I believe the evidence in the record is that they meant to discuss the numbers during the first week of the month, that the numbers closed on, I believe, the first day of the month, and that the supervisors known to the collectors would meet, and that they didn't know if there was a specific date that they would be talked to by their supervisors regarding that number, those numbers. And then what about the testimony that Judge Smith referred to, which makes it sound a little less precise, in other words, as to whether they actually act on numbers and whether there's a certain amount of discretion to the supervisors? Is there any further evidence in the record that we ought to look to on that point? The record shows that Ms. De La Rosa and Ms. Ochoa both testified that when they did not make their numbers, that they were spoken to by their supervisors, whether it be moving them to Plan 2, which Ms. Aliota was already in, reducing her pay, which Ace had done with Aliota in December, and that they also testified they knew of other collectors that had been terminated. Well, but you didn't really answer my colleague's question. Is there other evidence in the record besides these affidavits which substantiate them? The affidavits were pretty clear, or the depositions. They said you don't terminate people who don't meet their quotas. It depends totally on the supervisor. So here's the supervisor in the meeting where we determine whether to terminate and maybe not need to tell anything about it. If the supervisor says, go ahead with the termination and knows all this stuff, then you can't get out on summary judgment. Well, Ms. De La Rosa and Ms. Ochoa did testify that it depended on possibly who your supervisor was. But the evidence in the record— How good of friends you were with them. And the evidence in the record is that when Mr. Velasquez reviewed his collector's numbers, he identified Ms. Eliota as well as this other individual as failing to meet their quotas. He met with all of the collectors in December to remind them how critical it was and that they would be terminated for not meeting those numbers. And when the three months elapsed and they had not met those numbers, Mr. Velasquez terminated both of those individuals. Thank you. Thank you. You have some time for rebuttal. As to the retaliation claim, there are disputed factual issues surrounding the main issue in this claim, which is whether Ace's given reason is the real reason she was fired. It's disputed when they decided to fire her and who made that decision. These are important factual disputes that should be resolved by a jury. What evidence do we have that Velasquez wasn't the guy? We have Ace's own characterization of the decision as a joint one. Velasco says we had decided to terminate her in his declaration. Dwyer calls it our decision. The record at page 179 shows this. And the HR rep said the two told her they were terminating her, and that combined with their behavior. The two supervisors met to review performance, they met to make the decision together, and they met to fire her together, showing that this is a joint decision and at the very least Dwyer is involved and he knows about her complaints. But what's not disputed for this claim is that she's fired two hours after she complains. Dwyer was at the meeting where the decision to fire her was made, and Dwyer prepared the termination paperwork. This is shown by Dwyer's own written statement, a record at page 44. He says, quote, about an hour later, Miguel came in the office. We had our morning meeting. We had a few terminations to do, and I went and put together the reports, did my morning duties, and then we started the production termination. And there is no documentary evidence showing that Ace actually decided to make this decision previously. It's just the supervisor's statements. Counsel, do you concede that Ms. Alioto had not met her quota for over seven months? Yes. And do you concede that, in fact, she had been disciplined for improperly using the computer system? Yes, her along with another employee. Right. Okay. Thank you. Thank you. And quickly on hostile work environment, the point is, is that the harassment kept happening and it got worse, and Ace knew that there was a problem. Thank you, Your Honors. Thank you. We request the score reverse. Thank you. The case of Alioto v. Associated Creditors Exchange is submitted. I do appreciate the university and the supervisors participating in our pro bono program. And I know Counsel for Associated Creditors probably appreciates having a brief that it can respond to in concrete form. So I also thank you for your argument here today as well.
judges: Benitez, McKeown, Smith